## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **GLENN A. BLANTON,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:15cv00023 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Glenn A. Blanton, ("Blanton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Blanton protectively filed his applications for DIB and SSI[1] on October 11, 2011, alleging disability as of September 15, 2011, due to a herniated disc in his thoracic spine, carpal tunnel syndrome, depression and inability to handle stress. (Record, ("R."), at 324-40, 355, 359, 397, 407.) The claims were denied initially and upon reconsideration. (R. at 181-204.) Blanton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 205.) Blanton's original hearing was scheduled on June 13, 2013; however, Blanton requested a continuance so that he could submit additional evidence related to an upcoming neurological examination. (R. at 102-20.) The ALJ held a second hearing on January 15, 2014, at which Blanton was represented by counsel. (R. at 37-78.)

By decision dated March 28, 2014, the ALJ denied Blanton's claims. (R. at 12-31.) The ALJ found that Blanton met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 15.) The ALJ found that Blanton had not engaged in substantial gainful activity since

---

[1] On October 24, 2011, Blanton's application for SSI was denied based on him having too much income to be eligible for SSI. (R. at 181-85.)

September 15, 2011, the alleged onset date.[2] (R. at 15.) The ALJ found that the medical evidence established that Blanton had severe impairments, namely thoracic and lumbar spine arthrosis; headache disorder; gastroesophageal reflux disease, ("GERD"); history of hyperlipidemia; vertigo; carpal tunnel syndrome, status-post bilateral carpal tunnel release; borderline intellectual functioning; anxiety; and depression, but he found that Blanton did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15, 21.) The ALJ found that Blanton had the residual functional capacity to perform simple, unskilled, light work[3] that did not require him to sit more than four hours in an eight-hour workday; that did not require him to stand and/or walk more than four hours in an eight-hour workday; that did not require more than occasional crouching, stooping and overhead reaching; and that did not require continuous reaching, handling or fingering with the bilateral upper extremities. (R. at 27.) The ALJ found that Blanton was unable to perform his past relevant work. (R. at 29.) Based on Blanton's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Blanton could perform, including jobs as a gate guard/night guard and a cafeteria attendant. (R. at 29-30.) Thus, the ALJ concluded that Blanton was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 31.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

---

[2] Therefore, Blanton must show that he was disabled between September 15, 2011, the alleged onset date, and March 28, 2014, the date of the ALJ's decision, in order to be eligible for DIB benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

After the ALJ issued his decision, Blanton pursued his administrative appeals, (R. at 6-8, 423-25), but the Appeals Council denied his request for review. (R. at 1-5.) Blanton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). This case is before this court on Blanton's motion for summary judgment filed May 13, 2016, and the Commissioner's motion for summary judgment filed June 14, 2016.

## II. Facts

Blanton was born in 1975, (R. at 324, 328), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Blanton has a high school education and past work experience as a material handler, an installer of mobile homes, an order clerk and a machine operator. (R. at 29, 66-68, 116-18, 360.) Blanton stated that medication helped his headaches "a little bit." (R. at 46.) He stated that he could stand and walk for up to five minutes without interruption. (R. at 50.) Blanton stated that, when he stands for a long time, his legs feel "real heavy." (R. at 50.) He stated that it was difficult for him to keep his balance due to dizziness. (R. at 52.) Blanton stated that he experienced periods of blurred vision. (R. at 53.) He stated that he quit his job because he "started messing up" and he did not want to be fired. (R. at 54-55.) Blanton stated that his medication helped his symptoms of anxiety. (R. at 55.) Other than being evaluated by psychologist Steward, Blanton stated that he had not been treated by a psychologist, counselor or mental health therapist. (R. at 55-56.) Blanton stated that he had never used cocaine or illegal drugs, and that, while he had consumed alcoholic beverages in the past, he was not an alcoholic. (R. at 64-65.)

-4-

Medical expert, Dr. William S. Erwin, Jr., M.D., also testified at Blanton's hearing. (R. at 57-64.) Dr. Erwin stated that the record showed that Blanton had an abnormal MRI; GERD; thoracic and lumbar osteoarthrosis; bulging discs; a history of hyperlipidemia; a history of chronic tenderness and vertigo; and a history of depression and anxiety. (R. at 60-61.) Dr. Erwin stated that Blanton's impairments did not meet or equal a listed impairment. (R. at 62.) He stated that, Steward's assessment, indicating that Blanton's emotional and psychiatric problems were so severe that he could not work, was the first time that the record indicated that Blanton suffered from such a severe level of depression and anxiety. (R. at 62.) Dr. Erwin stated that, if Steward's assessment was accepted, Blanton would meet a psychiatric listed impairment. (R. at 62.) He stated that Blanton's documented functional impairments, aside from his documented physical impairments, were not severe enough to render him unable to work. (R. at 63.) Dr. Erwin stated that there would be some impact on Blanton's activities as a result of osteoarthrosis of the thoracic lumbar spine. (R. at 63.) Dr. Erwin stated that Blanton's physical impairments would not preclude him from sitting six hours in an eight-hour workday or limit him to less than six hours of standing and/or walking in an eight-hour workday. (R. at 64.)

Gerald Wells, a vocational expert, also was present and testified at Blanton's hearing. (R. at 66-76.) Wells was asked to consider a hypothetical individual of Blanton's age, education and work history, who would be limited to simple, light work that did not require more than occasional overhead reaching, stooping and crouching; that did not require more than frequent reaching, handling or fingering; and who would be able to understand, remember and carry out short, simple instructions, to follow a supervisor's directions, to interact with others and to adapt to or respond to routine work changes. (R. at 68-69.) Wells stated that the

individual could perform jobs existing in significant numbers in the national economy, including those of a mail room clerk and an order filler. (R. at 69.) Wells was asked to consider the same individual, but who would be limited to sedentary[4] work. (R. at 70.) He stated that there would be jobs available that such an individual could perform, including jobs as a dispatcher of maintenance workers, an inspector, a tester/sorter and a surveillance monitor. (R. at 69-71.) He stated that all jobs identified would allow for some alternation of sitting and standing while remaining at the work station. (R. at 71-72.) He stated that all jobs identified would be eliminated if the individual was limited to only occasional bilateral handling, fingering and feeling. (R. at 72.) When asked if the individual would be limited to only occasional handling, fingering and feeling with one upper extremity, Wells stated that there would be a very narrow range of jobs available, such as a ticket taker and a host. (R. at 72-73.) Wells stated that it would be difficult for a person to sustain work in these jobs if they were absent from work more than one day a month. (R. at 73.)

When asked to consider an individual who could occasionally lift 20 pounds and sit, stand and/or walk up to four hours in an eight-hour workday, Wells stated that the individual could perform jobs as a gate guard, a night guard and a cafeteria cashier. (R. at 74-75.) Wells stated that these jobs did not require overhead reaching, more than occasional stooping and crouching and constant other reaching, handling and fingering. (R. at 75.) He stated that, as long as the

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2016).

individual could follow short, simple instructions, follow a supervisor's directions and interact with others appropriately, the individual could perform the jobs as a gate guard, a night guard and a cafeteria cashier. (R. at 75.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Robert Keeley, M.C., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Appalachian Orthopaedic Associates, P.C.; Dr. Matthew W. Wood, Jr., M.D.; Stacey Gipe, P.A., a physician's assistant; L. Andrew Steward, Ph.D., a licensed clinical psychologist; Dr. Gale E. Jackson, M.D.; Dr. Emily S. Shields, M.D., a neurologist; Dr. Larry Hartman, M.D.; Dr. Wes Campbell, D.O.; Norton Community Hospital; Dr. David Jones, M.D., a neurologist; University of Virginia Hospital; and Dr. Pema O. Bhutia, M.D.

On August 12, 2010, Blanton underwent an electromyogram and nerve conduction study, which showed moderately severe bilateral carpal tunnel syndrome. (R. at 672.) The record shows that Blanton underwent bilateral carpal tunnel release in October and November 2010. (R. at 427, 475-78.) In January 2011, Blanton reported that his numbness, paresthesias and pain had resolved. (R. at 428.) He reported that he had returned to work without any problems. (R. at 428.)

On October 25, 2010, Blanton saw Stacey Gipe, P.A., a physician's assistant with Appalachian Healthcare Associates, P.C., for complaints of thoracic back pain and headaches; however, he stated that he was doing better. (R. at 497.) Blanton reported that his back pain was doing much better and that he was doing well following bilateral carpal tunnel surgery. (R. at 496.) On September 15, 2011,

Blanton's examination was normal with the exception of tenderness over his thoracic spine. (R. at 494.) Gipe ordered a thoracic MRI and referred Blanton for a neurosurgery consultation. (R. at 494.) On September 23, 2011, an MRI of Blanton's thoracic spine showed some Schmorl's nodes at the mid thoracic spine with some mild, chronic appearing compression deformities; left paracentral disc protrusion osteophytes complex at the T6-T7 level; and some minor degenerative changes at the T5-T6 level. (R. at 674.) On October 27, 2011, Blanton reported that he was doing much better overall. (R. at 490.) He stated that his pain was under control with medication. (R. at 490.) Gipe noted that Blanton had good grip strength in both hands; he had mild tenderness and some paraspinous thoracic muscle spasm of the back; straight leg raising tests were negative; he had good dorsal plantar flexion of the feet; and a normal gait. (R. at 490-91.) Gipe noted that a form was completed to keep Blanton out of work, but she stated that she could not do this indefinitely. (R. at 491.)

On November 3, 2011, Gipe and Dr. Wes Campbell, D.O., completed a physical assessment, indicating that Blanton could occasionally lift and carry items weighing up to five pounds; that he could stand and/or walk up to 10 minutes without interruption; and that he could sit up to 15 minutes without interruption.[5] (R. at 512-14.) They reported that Blanton could not climb; stoop; kneel; balance; crouch; and crawl. (R. at 513.) They found that Blanton's abilities to reach, to handle, to feel, to push and to pull were affected by his impairment. (R. at 513.) No environmental restrictions were noted. (R. at 514.) They noted that Blanton was "not able to work at all." (R. at 514.) On January 5, 2012, Blanton stated that, despite the neurosurgeon's belief that he would have no problem with returning to

---

[5] Gipe and Dr. Campbell did not indicate how many hours that Blanton could sit, stand and walk in an eight-hour workday. (R. at 512-13.)

regular work, he was afraid to return to work because he continued to have pain when he did not take his pain medication. (R. at 534.) Gipe noted that Blanton had good range of motion of the thoracic spine; he had negative straight leg raising tests; and he had tenderness over the thoracic paraspinous muscles. (R. at 534.) She reported that Blanton was obviously stressed and mildly depressed. (R. at 534.)

On October 21, 2011, Dr. Matthew W. Wood, Jr., M.D., a neurosurgeon, saw Blanton for complaints of thoracic pain with lower extremity paresthesias and weakness. (R. at 486-87.) Upon examination, Blanton's upper and lower extremity strengths were normal and symmetric; dorsiflexion and plantar flexion were intact; he had no focal tenderness to palpation in the posterior cervical, thoracic or lumbar region; he had good range of motion of the shoulders with no signs of impingement; straight leg raising tests were negative; his hip examination was unremarkable; and he was neurologically intact. (R. at 486.) Dr. Wood noted that an MRI study performed on September 23, 2011, revealed a small paracentral and left T6-T7 disc protrusion without central canal compromise, spinal cord compression or significant neural foraminal stenosis and a mild encroachment of the T7 nerve root. (R. at 486.) Dr. Wood diagnosed small paracentral and left T7-T7 disc protrusion; thoracic discomfort with some radicular complaints in a T7 distribution; lower extremity paresthesias with fatigue and heaviness of unclear etiology with no findings on his recent MRI study or physical examination; bilateral carpal tunnel decompression performed in 2010; anxiety; GERD; and tobacco use. (R. at 486-87.) Dr. Wood noted that Blanton's small disc protrusion would not cause his lower extremity paresthesias or complaints of heaviness, but could result in some periodic exacerbation of thoracic pain and radicular discomfort. (R. at 487.) Dr. Wood also noted that Blanton and his wife were not receptive to his findings and discussions regarding Blanton's recent MRI study and

the fact that Blanton was not at increased risk for impending paralyzation. (R. at 487.)

On November 28, 2011, Dr. Larry Hartman, M.D., saw Blanton for complaints of chronic back pain and numbness. (R. at 527-30.) Blanton denied depression, anxiety, nervousness and hallucinations. (R. at 528.) Dr. Hartman noted that Blanton's neck was tender with a severely diminished range of motion of the cervical spine; he had marked tenderness over a single spinous process in the lower thoracic region; diminished range of motion of the lumbar spine; no atrophy, cyanosis or ecchymosis of the extremities; he was fully oriented; and his deep tendon reflexes were intact and symmetric. (R. at 528-29.) Dr. Hartman found no evidence of a particularly focal radiculopathy, and he noted that the source of the numbness in Blanton's lower extremities did not appear to be consistent with a thoracic lesion, as most of his pain was myofascial. (R. at 529.) Dr. Hartman recommended conservative treatment, including physical therapy.[6] (R. at 530.) On December 5, 2011, an MRI of Blanton's lumbar spine showed mild lumbar discogenic disease. (R. at 516-17, 525-26.) On January 4, 2012, Blanton's deep tendon reflexes were intact and symmetric; his motor examination was intact; and he had good range of motion of the lumbar spine, but demonstrated diminished sensitivity to pain involving both lower extremities extending to the hips. (R. at 520-21.) Dr. Hartman noted that Blanton's disc bulges at the L6 level were not of clinical significance. (R. at 521.) He noted that Blanton did not have a clinical syndrome consistent with a surgically remediable lesion in either the thoracic or lumbar regions. (R. at 521.)

---

[6] Blanton participated in physical therapy at Mountain States Rehabilitation from December 19, 2011, through February 8, 2012. (R. at 519, 523-24, 542-63.)

On December 20, 2011, Dr. Robert Keeley, M.C., a state agency physician, opined that Blanton had the residual functional capacity to perform medium[7] work. (R. at 139.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 110.)

On April 6, 2012, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Blanton had no restrictions in his activities of daily living or in maintaining social functioning; had mild difficulties in maintaining concentration, persistence or pace; and that he had experienced no repeated episodes of decompensation of extended duration. (R. at 151-52.) Leizer noted that Blanton's impairment was controlled with medication. (R. at 152.)

On April 10, 2012, Dr. Joseph Duckwall, M.D., a state agency physician, opined that Blanton had the residual functional capacity to perform medium work. (R. at 153-55.) He opined that Blanton could frequently climb ramps and stairs, balance, kneel and crouch and occasionally climb ladders, ropes and scaffolds, stoop and crawl. (R. at 154.) No postural, manipulative, visual or communicative limitations were noted. (R. at 155.)

On August 7, 2012, Blanton saw Dr. Gale Jackson, M.D., for complaints of dizziness and numbness and tingling in his hands. (R. at 569-71.) Blanton's physical examination was normal with the exception of tenderness in the thoracic and lumbosacral spines. (R. at 571.) On August 30, 2012, Blanton complained of

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2016).

left facial pain; left anterior cervical pain; left-sided headache; and left ear pain associated with worsening vertigo, tinnitus and hearing loss on the left. (R. at 566-68.) Dr. Jackson admitted Blanton to Norton Community Hospital to rule out a transient ischemic attack. (R. at 568, 597-610.) On admission, Blanton underwent a CT scan of the head, which was normal. (R. at 597.) An MRI of Blanton's head was concerning for multiple sclerosis, ("MS"). (R. at 597-98.) An ultrasound of Blanton's carotid arteries was normal. (R. at 598.) An ultrasound of the soft tissue of Blanton's neck showed some small nonspecific lymph nodes. (R. at 598.) Blanton was then transferred to Johnson City Medical Center for a neurological evaluation with Dr. Stephen M. Kimbrough, M.D. (R. at 578-79, 598.) Dr. Kimbrough determined that Blanton's symptoms and findings were very suggestive of demyelinating disease (MS), and he recommended further evaluation. (R. at 579.)

Blanton then returned to Dr. Jackson for management of his general medical issues. (R. at 566-68, 676-79, 680-87.) Blanton reported improved vision disturbance and paresthesias, but complained of some left-sided weakness. (R. at 676, 680, 684.) Physical examinations were normal, with the exception of some paraspinal tenderness in the thoracic and lumbar spines. (R. at 678, 682, 686.)

On June 7, 2013, Dr. Jackson completed a mental assessment, indicating that Blanton had a seriously limited ability to make all occupational, performance and personal/social adjustments. (R. at 717-19.) Dr. Jackson found that Blanton would be absent from work more than two days a month. (R. at 719.)

That same day, Dr. Jackson completed a physical assessment, indicating that Blanton could occasionally lift and carry objects weighing up to 20 pounds; that he

could stand, walk and/or sit a total of four hours in an eight-hour workday and that he could do so for 30 minutes to one hour without interruption. (R. at 721-22.) He opined that Blanton could occasionally balance and never climb, stoop, kneel, crouch or crawl. (R. at 722.) Dr. Jackson indicated that Blanton's ability to push and pull was affected by his impairment. (R. at 722.) He opined that Blanton would be restricted from working around heights and moving machinery. (R. at 723.) He found that Blanton would be absent from work about two days a month. (R. at 723.)

On December 6, 2012, Blanton saw Dr. David Jones, M.D., a neurologist at the University of Virginia Hospital, for a possible diagnosis of MS. (R. at 612-17.) The examination was significant for some mild sensory deficit in the left side of the face and leg with a positive Hoffman's sign. (R. at 614.) Blanton had a normal gait and appropriate affect, mood and behavior. (R. at 613-14.) Dr. Jones opined that Blanton did not meet the criteria for MS, but that it could not be entirely ruled out. (R. at 614.)

On May 10, 2013, Blanton saw Dr. Pema O. Bhutia, M.D., to establish care. (R. at 730-33.) Upon physical examination, Blanton was in no acute distress and had a normal gait; full range of motion throughout; no tenderness on palpation; negative straight leg raising tests; no joint instability; normal muscle tone, bulk and strength; and no neurological deficits. (R. at 732.) His mood was euthymic, and he had an appropriate affect. (R. at 732.) Follow-up physical examinations through November 2013 were unchanged. (R. at 727, 747, 761.) In August and November 2013, Blanton reported that medication helped with his headaches. (R. at 745, 759.) He reported that his GERD was stable on medication and that his depression symptoms had improved with medication. (R. at 745, 759.) Blanton also reported

that his medications were helping with his chronic pain. (R. at 748.) Blanton had appropriate judgment; good insight; euthymic mood; and appropriate affect. (R. at 747, 761.)

On May 24, 2013, L. Andrew Steward, Ph.D., a licensed clinical psychologist, evaluated Blanton at the request of Blanton's attorney. (R. at 702-15.) Blanton reported memory and concentration problems. (R. at 704.) Blanton had a constricted affect and anxious and dysphoric mood. (R. at 704.) His thought content and organization were not impoverished or confused; he had average mental functions of general fund of knowledge, abstract reasoning, judgment and attention and concentration; and he had average memory functions. (R. at 704.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Blanton obtained a full-scale IQ score of 80. (R. at 711.) The Beck Anxiety Inventory, ("BAI"), and the Beck Depression Inventory - II ("BDI-II"), were administered, indicating that Blanton suffered from severe anxiety and severe depression. (R. at 711.) Steward diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; borderline intellectual functioning; and MS with body pain, memory and concentration problems, vision problems and severe ringing in the ears. (R. at 714.) Steward assessed Blanton's then-current Global Assessment of Functioning, ("GAF"),[8] score at 49.[9] (R. at 714.) Steward reported that Blanton appeared to be permanently and totally disabled. (R. at 715.)

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning…." DSM-IV at 32.

That same day, Steward completed a mental assessment, indicating that Blanton had a seriously limited ability to follow work rules; to use judgment; to function independently; to understand, remember and carry out detailed and simple job instructions; and to maintain personal appearance. (R. at 698-700.) He opined that Blanton had no useful ability to relate to co-workers; to deal with the public; to interact with supervisors; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 698-99.) Steward found that Blanton would be absent from work more than two days a month. (R. at 700.)

On June 26, 2013, Dr. Emily S. Shields, M.D., a neurologist, saw Blanton for a neurological examination. (R. at 741-44.) Dr. Shields reported that Blanton had intact recent and remote memory, attention span, concentration and language. (R. at 741.) He had normal fund of vocabulary, visual acuity and visual fields. (R. at 741.) Blanton had normal range of motion of the neck and spine. (R. at 741.) He had a normal gait and reflexes, and his extremities exhibited normal bulk and tone. (R. at 742.) On July 24, 2013, Blanton saw Dr. Shields for follow-up regarding abnormal MRIs of Blanton's brain. (R. at 756-57.) Dr. Shields noted that Blanton's MRI findings were consistent with migraines. (R. at 757.) Dr. Shields prescribed medication and a repeat MRI. (R. at 757.) Again, on September 5, 2013, Dr. Shields noted that an MRI of Blanton's brain, taken August 2, 2013, was representative of migraines. (R. at 755.) Blanton reported that his migraines improved with medication. (R. at 754-55.) Dr. Shields noted that Blanton had some difficulty with balance on his toes, but he had normal casual station and gait. (R. at 755.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

-16-

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Blanton argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) Blanton also argues that the ALJ erred by giving little weight to the mental assessments of Dr. Jackson, Steward, Gipe and Dr. Campbell. (Plaintiff's Brief at 6-8.) He further argues that the ALJ gave significant weight to Dr. Jackson's physical assessment, but rejected some limitations without valid reasons. (Plaintiff's Brief at 7.)

The ALJ found that Blanton had the residual functional capacity to perform simple, unskilled, light work that did not require him to sit more than four hours in

-17-

an eight-hour workday; that did not require him to stand and/or walk more than four hours in an eight-hour workday; that did not require more than occasional crouching, stooping and overhead reaching; and that did not require continuous reaching, handling or fingering with the bilateral upper extremities. (R. at 27.) Based on my review of the record, I find that substantial evidence exists to support this finding.

Blanton argues that the ALJ, in arriving at his residual functional capacity finding, should have given more weight to the opinions of Dr. Jackson, Steward, Gipe and Dr. Campbell. I find this argument unpersuasive. The ALJ noted that he was giving little weight to the opinions of Gipe and Dr. Campbell because they were not supported by the longitudinal evidence of Blanton's impairments and were not consistent with the level of activities that Blanton was performing during the period under adjudication. (R. at 28.) The ALJ also noted that their assessments did not appear to be assessments of impairment severity over time, but limited to one discrete period. (R. at 28.) Treatment records do not show a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance or reduced range of motion. (R. at 29, 529, 727, 732, 747, 761.) Gipe only saw Blanton three times between September 2011 and January 2012, and when she completed the medical source statement in November 2011, she noted that she could not keep Blanton out of work indefinitely. (R. at 490-91, 494, 507, 534.)

The ALJ also stated that he was giving little weight to Steward's opinion because other evidence of record did not document the level of debilitating mental deficits put forth by Steward. (R. at 27.) The ALJ noted that the GAF rating and functional limitations also were not supported by the other medical treatment

evidence of record. (R. at 27.) The ALJ further noted that the medical evidence Steward reviewed did not document mental functioning prior to Steward's evaluation that supported the GAF rating assessed by Steward; thus, the ALJ found that Steward's opinion was wholly inconsistent with Blanton's lack of mental health treatment. (R. at 27.)  In fact, treatment notes dated prior to Steward's evaluation show nothing more than one notation of "mild depression" and a prescription for Celexa. (R. at 534, 573.) Dr. Jackson's treatment notes do not document subjective complaints of depression or anxiety; objective psychiatric findings; or a psychiatric diagnosis. (R. at 566-75, 676-87, 689-95, 707.) Treatment notes dated after Steward's evaluation are likewise unremarkable, documenting that Blanton was in no acute distress with euthymic mood, appropriate affect and judgment and good insight. (R. at 613, 732, 747, 761.) In June 2013, Blanton had intact recent and remote memory, attention span and concentration. (R. at 741.)

The ALJ noted that he was giving little weight to Dr. Jackson's mental residual functional capacity assessment because it conflicted with the other evidence of record and was outside the scope of Dr. Jackson's expertise. (R. at 26, 717-19.) Dr. Jackson's treatment notes do not document subjective complaints of depression or anxiety; objective psychiatric findings; or a psychiatric diagnosis. (R. at 566-75, 676-87, 689-95.) In fact, the record shows that in May 2013, one month prior to Dr. Jackson's mental residual functional capacity assessment, and in August 2013, two months following Dr. Jackson's assessment, Blanton reported that his depression symptoms had improved with medication. (R. at 745, 759.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ did give Dr. Jackson's June 2013 physical residual functional assessment significant weight. (R. at 28.) The ALJ noted that the evidence of record supported Dr. Jackson's opinion that Blanton could lift and/or carry items weighing up to 20 pounds occasionally; sit four hours in an eight-hour workday; and stand and/or walk up to four hours in an eight-hour workday. (R. at 28, 721-22.) However, the ALJ determined that Dr. Jackson's finding that Blanton could never climb, stoop, kneel, crouch or crawl and that he would miss two days of work per month were not supported by the objective evidence of record. (R. at 28, 722-23.) Specifically, the ALJ noted that Dr. Jackson's opinion was inconsistent with his own clinical notes, which failed to document anything more than some paraspinal tenderness. (R. at 28, 678, 682, 686.) In addition, Dr. Jackson failed to document why such benign findings would result in such extreme limitations. (R. at 28.) Treatment notes do not show a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance or reduced range of motion. (R. at 29, 727, 732, 747, 761.) Physicians ruled out MS as a diagnosis, and two separate examining neurologists determined that Blanton did not have a surgically remediable back impairment. (R. at 487, 521.) Furthermore, Blanton reported that medication helped control his chronic pain and migraines. (R. at 490, 745, 748, 754, 759.) *See Gross,* 785 F.2d at 1166.

The ALJ stated that he was giving significant weight to Dr. Erwin's testimony. (R. at 28.) Dr. Erwin stated that Steward's assessment, indicating that Blanton's emotional and psychiatric problems were so severe that he could not work, was the first time that the record indicated that Blanton suffered from such a severe level of depression and anxiety. (R. at 62.) He stated that Blanton's documented functional impairments, aside from his documented physical impairments, were not severe enough to render him unable to work. (R. at 63.) Dr.

-20-

Erwin stated that Blanton's physical impairments would not preclude him from sitting six hours in an eight-hour workday or limit him to less than six hours of standing and/or walking in an eight-hour workday. (R. at 64.)

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding as to Blanton's residual functional capacity.

Based on the above reasoning, I find that substantial evidence exists to support the ALJ's conclusion that Blanton was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:    February 1, 2017.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE